IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,358




 


JOE LUNA, Appellant



v.



THE STATE OF TEXAS






ON DIRECT APPEAL

FROM CAUSE NO. 2006-CR-0033 IN THE 379TH DISTRICT COURT

BEXAR COUNTY




 Hervey, J., filed a concurring opinion in which Womack and Johnson, JJ., joined. 
 

 CONCURRING OPINION


 In point of error thirteen, appellant claims that the trial court erred in denying appellant's
"motion to suppress an impermissibly suggestive identification which created a substantial likelihood
of misidentification at trial." While I join the majority's disposition of this point of error, I write
separately to emphasize my concern about the identification procedure employed.

 As we stated in Barley v. State, 906 S.W.2d 27, 33 (Tex.Cr.App. 1995), "[s]uggestiveness
may be created by the manner in which the pre-trial identification procedure is conducted, for
example by police . . . suggesting that a suspect is included in the photo array." The record from the
suppression hearing reflects that appellant was not a suspect when Detective Leonard began showing
pictures to appellant. When appellant later became a suspect, Leonard showed Tovar a six-person
photo array with appellant's picture in it. Here, Leonard's testimony reveals:

 Q. [STATE]: And when you presented that photo lineup to Mr. Tovar, how did you
present it to him?


 A. [DETECTIVE LEONARD]: I-I sat it down in front of him and I told him, Okay,
there's a suspect in this lineup. I can't tell you who it is. Let me know if there's
anybody that looks familiar to you.


 Q. You told him there was a suspect in the lineup?


 A. We have-we have a suspect and we've placed him in the lineup, and let me know
if there's anybody that looks suspicious to you. I'm sorry. Excuse me. That looks
familiar to you.


 Q. And did he recognize anyone?


 A. As I was laying it down, he pointed to [appellant] and said, That's him.


 Very soon after this, the State continued to question Leonard on whether he told Tovar that
there was a suspect in the six-person photo array.

 Q. Detective Leonard, I'm going to ask you to look at page four of your report, the
entry that's dated August 11th of 04, 15:17 hours.


 A. Okay.


 Q. In there-do you have in your report that you told [Tovar] that there was a suspect
in the lineup?


 A. No.


 Q. Okay. And so is that just something that you have remembered today?


 A. No. I don't specifically remember saying there was a suspect. I told him there
was somebody, a suspect, I just used that word, an individual.


 Q. That's the issue we're here on right now. So it's very important that you are very
specific about what you told [Tovar]. Take a minute and remember exactly what
instructions you gave Mr. Tovar when you handed him that lineup.


(Pause in Proceedings)


 A. Well I try and keep to the same script every time. What I-what I would tell them,
and I'll say it is exactly as I always say to people: Okay. What we have are six
individuals. The suspect may or may not be in the lineup. We can't tell you. You
just need to let us know if anybody looks familiar.


 Q. So is that what you remember telling Mr. Tovar, or what you said before? Which-


 A. Well that's what I use every time. When I-I said, Well the suspect may be in
there. I'm just going through-I was paraphrasing.


 Prior to Leonard's testimony, the witness, Tovar, testified that he "knew exactly" what the
suspect looked like and that he immediately recognized appellant's picture from the photo array
without Leonard suggesting which picture to choose. Tovar also testified that, immediately after
identifying appellant's picture from this photo array, he was shown another photograph of the back
of appellant's head and that he recognized the tattoo on the back of appellant's head.

 Q. [STATE]: And there came a time when you looked at a photo lineup and you did
recognize someone. Is that correct?


 A. [TOVAR]: Yes. Yes.


 Q. Tell the Judge how-what instructions the detective gave you when he presented
these photographs to you to look at?

* * *

 A. I can't really say instructions. He just showed me, these are more pictures that we
have here. See if, you know--


 Q. Why was he asking you to look at photographs?


 A. Because I-I knew exactly what he looked like. And I mean, I had described him
completely. And the biggest thing I remember was the tattoo on the back of the head.

* * *

 Q. Towards the end he showed you-Detective Leonard showed you a photo lineup
and you finally recognized someone in those pictures. Correct?


 A. Correct.


 Q. When he showed you-when he handed you that piece of paper with photographs
on it, did he suggest to you in any way that you-that-what picture to choose from
those photo lineups?


 A. No. No.


 Q. Did he tell you that you should pick someone out of that photo lineup?


 A. No.

* * *

 Q. When you finally did recognize someone, did you tell him immediately?


 A. Before he put it on the table, I saw it and I said, That's him right there.

* * *

 Q. [DEFENSE]: Did he tell you-what did the officer say to you after you identified
[appellant]?


 A. He was-he asked me, Are you sure? Well, he was-he was startled, because
he-before he even put the paper down, That's him. Because I saw him facing
forward. And like, I had already told him about the tattoo on the back. And he like,
he was startled, right, that I pointed him out right away. And when he showed me the
side picture of him, he asked me, Are you sure? Are you sure? He goes, Let me
show you this. And that's when he showed me the side photo. And I go, Yeah; I told
you that's him. That's the one.

* * *

 Q. [STATE]: Did he also show you-after you had identified [appellant's] photograph
and signed it and dated it, did he also show you a photograph then of a tattoo on the
back of the head?


 A. Yes.


 Q. And did you recognize that tattoo?


 A. Yes.


 Tovar seemed to suggest on cross-examination, however, that Leonard told him that the six-person photo array contained a suspect; but then immediately seemed to suggest otherwise.

 Q. [DEFENSE]: Did he tell you they had a new batch of suspects?


 A. [TOVAR]: No. No.


 Q. Did he tell you this-they had identified someone and you should look through this
new batch?


 A. The second time?


 Q. Yeah.


 A. The second time, yes; that they might have gotten somebody.


 Q. So then-so they told you they might have gotten somebody and to--


 A. You know what, I'm sorry. It was after. It was after the second time. I got a call
from him. He told me, You know what, I think we might have identified-that's when
he told me that they might have identified somebody that fit that description. Well,
but I had already identified the picture. So it doesn't make sense. But--


 The trial court recessed the proceedings for the day. The next day, the State argued to the
trial court that the photo lineup was not impermissibly suggestive and that "Detective Leonard
changed what he had initially said regarding whether he told [Tovar] . . . that there was a suspect in
the lineup or not." The trial court denied appellant's motion to suppress Tovar's in-court
identification and ruled:

 [TRIAL COURT]: All right. Here's my ruling. I've looked at the real-time that I
have the benefit of here on the bench. I've looked at the cases. And let me just read
into the record-so it doesn't have to be reviewed again. Let me go up to it. I know
Detective Leonard's initial testimony was-I don't want to say it was unclear, but
it-he was subsequently re-asked the question, what exactly did you tell him.


 But before I even address that issue, I've reviewed the testimony of Mr. Tovar. And
I think on direct examination and cross examination the question came up repeatedly
about being shown the photo lineup. And his answer here is best summarized when
the question was posed: When he showed you-when he handed you the piece of
paper with the photographs on it, did he suggest to you in any way that-what picture
to choose from those photo lineups? And the answer was no. No. Question. Did
he tell you you should pick someone out of that photo lineup? Answer. No. 
Question. So what did he tell you when he put the photographs in front of you? 
Answer. He-he would hand them to me and, Look through these. You don't
recognize no one? No (sic) look at these. Question. Okay. Answer. Look through
this one-through this one. Question. When you finally did recognize someone, did
you tell him immediately? Answer. Before he put it on the table, I saw it-his answer
is: Before he put it on the table, I saw it and said, That's him right there. Question. 
Okay. I'm going to show you [the photo array]. Even though this is black and white,
do you recognize this as a copy of photo lineup? Answer. Yes. Yes.


 I think we all agree initially that Detective Leonard said something about when he
initially handed him the photo lineup that it might have had a suspect. And he was
subsequently re-asked that question on redirect or cross examination, I can't
remember the order. The question came from the State. Let me just find it.


 He was re-asked the question following some questions by [the defense]. And the
State asked: Take a minute and remember exactly what instructions you gave Mr.
Tovar when you handed him the lineup. And his answer was, Well I try to keep the
same script every time. What I-what I-what I would tell them, and I'll say it exactly
as it (sic) I would say it to people. Okay. What we have here are individuals. The
suspect may or may not be in the lineup. We can't tell you. You just need to let us
know if anybody looks familiar. Question. Is that what you remember telling Mr.
Tovar, or what you said before? Which-Answer. Well, that's what I use every time.

 So that was his response. And having reviewed these cases and other cases, I can't
find anything that stands for the proposition that after somebody's looked at some
900-plus photos if (sic) individuals who have not been identified are in those 900
photos it would render that lineup overly suggestive to where an in-court
identification would be suppressible. So I'm going to deny the motion to suppress
the photo ID at this time. (1)


 Despite my concerns regarding the process employed, the trial court's decision is reviewed
on appeal under an abuse of discretion standard. This record, viewed in the light most favorable to
the trial court's ruling, supports the trial court's decision to deny appellant's motion to suppress
Tovar's in-court identification of appellant connecting him to the extraneous aggravated robbery of
Tovar. The trial court could have reasonably found that the process culminating in Tovar's
identification of appellant was not impermissibly suggestive and that, even if the process was
impermissibly suggestive, it did not create a substantial likelihood that Tovar misidentified appellant.

 Notwithstanding this, any error in the trial court's ruling was rendered harmless when
appellant later took the stand and admitted committing the aggravated robbery of Tovar (2) and also
testified that he got a "rush" from breaking into peoples' homes while they were home and that he
should be sentenced to death.

 Q. [STATE]: You mentioned that you were guilty of every crime that we proved up
in the past week. Is that right?


 A. [APPELLANT]: I'm guilty of every crime you all brought up plus--


 Q. And you also indicated that there was some crimes that we hadn't brought up?


 A. Many crimes.

* * *

 Q. The adrenaline rush that you were addicted to. Terrorizing people gave you a
rush?


 A. Not really terrorizing them, just the fact that I was in a home while they were there
gave me a rush.


 Q. You terrorized the McGloughlins. Correct?


 A. Correct.


 Q. You terrorized the D'Amicos. Correct?


 A. Correct.


 Q. You terrorized Vicky Calsada. Correct?


 A. Correct.


 Q. And that gave you a rush.


 A. It did.


 Q. And let's not forget Candido Tovar. You terrorized him too, didn't you?


 A. Correct.


 Q. And that gave you a rush?


 A. It did.

* * *

 Q. Isn't it a fact, Mr. Luna, that throughout the past year you have plotted, and
planned, and schemed, and the scheme that you finally came up with was, if I tell this
jury I want the death penalty, they're going to be so sickened by my crimes that
they're going to give me what I don't want, which is, according to you, a life
sentence. Isn't that what this little show is all about?


 A. No. I don't see myself spending the rest of my life in prison. I get out I'll be 70
years old. What am I going to have? Everybody I know, my mom, my dad, chances
are, they're going to be passed away. I ain't going to have nothing. I get out-I would
have spent more life in prison in 40 years than I have spent in my whole life. So
what would I have to lose. Given the death sentence I would be able to focus my
attention on getting strengthened spiritually and not be sidetracked.


 This is not no scheme. This is the truth. I'm not afraid of getting the lethal injection. 
I'm not afraid of death. So no, this is not no scheme.

* * *

 Q. Let me make sure we have all this straight, Mr. Luna. You want this jury to
answer special issue number one, yes; that you are a future danger?


 A. Because I am.


 Q. And you want this jury to answer special issue number two, no; because there is
no sufficient mitigating reason to spare your life. That's what you want. Correct?


 A. Correct.


 Q. No question about it?


 A. No question about it.


 Q. Are you going to give up all your appeals?


 A. I'm not going to try to appeal to nothing.


 Q. Okay. So you're done.


 A. Yep.


 Q. And that's what you want.


 A. That's exactly what I want.


 Q. And it's your testimony that this isn't some sort of little reverse psychology ploy?


 A. No.


 On this record, any error in the trial court's ruling admitting Tovar's in-court identification
of appellant connecting him to the aggravated robbery of Tovar could not have affected the jury's
answers to the special issues. With these comments, I join the Court's opinion.


 Hervey, J.


Filed: October 29, 2008

Publish

1. No evidence was presented that appellant's photograph was among any of the other
approximately 900 photographs that Tovar viewed prior to identifying appellant's photo from the
six-person photo array at issue here. Leonard was unable say whether Tovar had previously viewed
the other five photos in this array. Leonard testified:


 Q. [DEFENSE]: He may have seen the other five-or he probably had seen the other
five during all the other lineups that he had seen. Correct?


 A. [LEONARD]: I have no way of knowing if he had seen them during all the mug
book viewings because he went through several, several photographs. We're talking
close to nearly 900 photographs he had gone through. The only point in this that I'm
able to say is he never identified anybody after seeing so many individuals until he
got to [appellant]. That's how positive he was.
2. See Leday v. State, 983 S.W.2d 713, 718 (Tex.Cr.App. 1998) (erroneous ruling admitting
evidence is not reversible error when other such evidence is admitted without objection either before
or after the complained-of ruling).